# Brown *versus* Corey & Peterson.

*Constitutionality of Lateral Railroad Laws.— Withdrawal of Appeal. —Underground Right of Way.—Damages, measure of.*

1. An appeal, under the Lateral Railroad Law, from a report of viewers, cannot be discontinued after twenty days have elapsed from the filing of the report, without consent of the opposite party. *Query*—Can it be so discontinued within the twenty days without notice to the appellee?

2. Proceedings may be had against the owner of a stratum of coal, as contradistinguished from the proprietor of the surface, to obtain from him an underground right of way.

3. An entry on another's land to build or use a lateral railroad, is an entry under the state, exercising the right of eminent domain, and in pursuance of public law; and all private contracts are subordinate thereto.

4. The measure of damages in such case is the injury done to the tract, *as a whole*, or the difference between its value at the time of the entry and its value after the completion of the railroad.

5. To ascertain this difference the jury are entitled to the benefit of the opinions of witnesses of skill and judgment, who have had opportunities to learn the value of the property in question, or of similar properties in the same neighbourhood, and the grounds of the opinions may also be given to the jury.

ERROR to the District Court of *Allegheny county*.

This was an appeal by William H. Brown from the report of the viewers appointed on the petition of James B. Corey and John H. Peterson, for a lateral railroad.

[Brown *v.* Corey & Peterson.] .

The issues were, 1st, in regard to the title of petitioners to the land and the coal claimed by them in their petition; and, 2d, should that issue be found in favour of petitioners, then the jury was to assess the damages which Brown would sustain.

The petitioners claimed to own a river landing containing about twenty acres, and about fourteen acres of coal under surface of D. Shaw, assignee of Moses Corey; also a larger body of coal in the rear, under the surface of Bowman and Gray, between which and their Shaw coal intervened the coal of Brown, lying under surface of M. Corey's assignee. The proposed road began at the Monongahela river landing, passed over the twenty acres of surface, through the fourteen acres of petitioners' coal, then directly through the centre of Brown's coal to the Bowman coal tract.

To sustain the issue upon their part, as to title, the plaintiffs offered a deed to them for the coal under the Bowman tract, dated September 30th 1859; and to show the title in them to the landing and the Corey coal, they offered a deed from Isaac Gill to Moses Corey, dated December 2d 1851, the voluntary assignment of Moses Corey to D. Shaw, January 7th 1856, and a deed from D. Shaw, assignee, to petitioners, for the premises, dated August 2d 1859. These deeds were read under exception by defendant, as not being sufficient record evidence of title. The plaintiff also offered evidence as to possession under the said deeds, and rested.

The defendant then offered a deed to him from Moses Corey, dated December 6th 1851, and duly recorded, conveying the coal through which the proposed road passed; also an article of agreement from said Corey, of same date. This deed and agreement contained sundry covenants on the part of Corey, looking to and facilitating the mining of the coal then purchased by Brown from Corey, which coal-mine Corey had previously opened, and partially mined.

The defendant then offered to prove that the construction and use of the road prayed for would destroy or very materially impair the value of the coal purchased by the defendant Brown from Moses Corey, and would materially impair if not wholly destroy the rights, privileges, and covenants granted and made in said deed from Corey to Brown. Among other things in this, that the greater portion of said Brown's coal could not be taken out except at such risk and expense as would render it almost if not altogether valueless, and that the remainder would not be of sufficient value to justify the construction of a road and improvements to take it out for market, all which was offered for the purpose of showing, in connection with said deed,

1. That petitioners are estopped from prosecuting their said petition.

[Brown *v.* Corey & Peterson.]

2. That petitioners have not such ownership of certain portions of the coal and land described in their petition as entitles them to prosecute their petition; and

3. Also, by way of establishing the amount of damages which defendant will sustain by the opening, constructing, and using of the road prayed for.

To which plaintiff's counsel objected:

1. That it is wholly incompetent for the first purpose, the plaintiffs claiming no right to build their road under Moses Corey, the grantor in the deed, but under the authority granted them by the Commonwealth.

2. That it does not tend to impeach the ownership of plaintiffs in any of the lands or minerals described in their petition, as alleged in the second purpose.

3. That for the third purpose the offer is too indefinite, not specifying the character of the damage done, by which the land is said to be depreciated in value. That the owner of mines is not entitled to damages on account of increased expense and inconvenience in working unopened mines, when he begins to work them.

Which objections were sustained, the evidence rejected, and a bill sealed.

The defendant subsequently renewed his offer of this testimony, to be followed by proof that previous to the filing of the present petition, and to the purchases of coal by petitioners, as given in evidence by them, the defendant had surveyed and laid off a railroad from the river to the coal purchased by him from Corey, with regular plans for a double entry through the said coal, intersecting nearly at right angles the petitioners' proposed road, and had begun to open and construct his said road, under and by virtue of the grants and covenants in his deed from Corey, but was prevented from going on with said road by the force and threats of violence, by the petitioners and their copartners in their proposed coal operations.

That the construction and use of petitioners' road would destroy the value of defendant's coal, would render it valueless as regards market value—that the use of cross-entries under ground would be wholly impracticable.

That defendant frequently applied to petitioners to take out his coal over their road, but that they have always refused to allow it; and that the petitioners' road has not the capacity to take out any more coal than they can run, and are now running day by day.

The plaintiffs objected to this offer, because,

1. The court has already ruled the former offer of defendants to be inadmissible, and the offer is not cured by the offer of the additional evidence proposed.

7 Wr.—32

2. The renewed offer contains matters irrelevant and incompotent; and

3. The evidence in reference to damages must be confined to specific facts relating to actual damage. The present offer is entirely too general.

Which objections were also sustained, and the evidence rejected.

Defendant then offered to show, by deeds and diagram, the quantity and extent of the coal owned by him, now and for a long time previous to the filing of this petition, and the laying off of petitioners' road; that the coal of defendant lies in one connected body, as shown in the diagram; to be followed by proof that, owing to the dip of the coal and its peculiar location, it is not practicable to take any of it out, except through entries which will intersect the petitioners' road.

The plaintiffs' counsel objected to the above offers as incompetent and irrelevant, because,

1. The defendant's deed, already in evidence, shows that the tract of coal through which plaintiffs' road is located is a distinct and separate tract, containing fifty acres, and the same appears from the deeds and diagram now offered.

2. The deeds now offered are for a body of coal lying at a great distance from the said tract of fifty acres.

The court allowed the defendant to show the extent of the coal owned by him under the tract through which this road passes; but the rest of the offer was rejected.

Defendant then offered to prove that he was the owner, before the filing of the petition in this case, of three hundred and twenty-five acres of coal in one body, through part of which the proposed road passes, for the purpose of showing what he owned; to be followed by evidence showing the direct injury done to said body of coal.

Plaintiffs objected that defendant has already shown by his deed in evidence that the body of coal through which said road passes is a distinct and separate tract of fifty acres; and, in point of fact, the deeds now offered and the diagram already exhibited show that any other coal owned by defendant constitutes a distinct body of coal not touched by said road.

The objection was sustained and the evidence rejected.

Defendant then offered in evidence deed dated December 6th 1857, from Moses Corey and wife. to William H. Brown; and also, as part of said deed and title, an agreement of same date between same parties, for the purpose of showing the extent of defendant's title to that part of the defendant's body of coal embraced in said papers, and the extent of the rights and privileges appurtenant to said coal, and acquired by defendant under said papers; to be followed by proof of the market value of said coal as enhanced by said rights and privileges.

To which plaintiffs' counsel objected,

[Brown *v.* Corey & Peterson.]

1. That the said deed is already in evidence.

2. That plaintiffs do not question defendant's title to the fifty acres of coal through which their road passes, but in their petition aver that he is the owner thereof; and

3. The article of agreement is irrelevant and incompetent, and refers to rights and privileges outside of said tract of coal, and not affected by said road.

The objection was also sustained, and the evidence rejected.

The defendant then proposed to ask one of the witnesses what would be a reasonable use of the plaintiffs' road, in order to make it worth their while to run it? Or, in other words, how much coal is ordinarily run upon a road like this, connected with mines such as those of the said plaintiffs? And this for the purpose of showing the depreciation in value of the defendant's coal-mine, and one of the reasons of that depreciation; which offer was objected to as incompetent and irrelevant; and because the question is hypothetical, and can only refer to speculative and imaginary damages.

The objection was also sustained and the evidence rejected.

The defendant then offered to ask the witness on the stand the following question :—Taking it for granted that Corey & Peterson have the right to run as much coal over their road as it is capable of carrying, what is the value of Brown's coal with Corey & Peterson's road running through it, and in use by them?

To which the plaintiffs objected that the witness has already stated that the only reason why the value of the coal is depreciated is the contingency of the construction of another road crossing plaintiffs' road, and the interfering operations of the two roads; and that the question is incompetent and irrelevant.

This objection was also sustained, and the evidence rejected.

The defendant also offered to prove by the witness that there is no other mode of access to the defendant's coal, which would make it worth the expense of carrying to market, except by means of a railroad crossing that of the plaintiffs' nearly at right angles; and that the effect of the construction and use of the plaintiffs' road is largely to increase the difficulty of access to the coal of the defendant.

To which plaintiffs objected that the offer is substantially the same as that which has already been repeatedly overruled. and relates to future and contingent mining operations, and also for general irrelevancy.

The objection was sustained, and the evidence rejected.

Defendant also offered to prove that previous to the laying off of petitioners' road, defendant, with the full knowledge of petitioners, had laid off and surveyed a road leading from the river up to and through the fifty acres of coal purchased from Corey, and directly across the proposed road, and had entered upon its construction, but was driven off by the threats and violence of

petitioners and their copartners; and further, that the coal pur-
chased by him from Corey had been opened and worked by
Corey previous to defendant's purchase, which opening and work-
ing it was the purpose of defendant's new road to carry on and
continue.   To be followed by proof that the construction and
use of petitioners' road would wholly obstruct defendant in the
use of his proposed road by crossing it at right angles, and would
render the fifty acres of coal valueless by reason of such obstruc-
tion, for the purpose of showing the damages which defendant
would sustain by the use of petitioners' road.

This was objected to as irrelevant and incompetent, and as
already overruled; which objection was sustained, and the evi-
dence rejected.

The defendant's counsel thereupon moved the court for leave to
withdraw his appeal from the report of viewers, and that the
court confirm the report, to which the plaintiff's counsel objected.
The court refused *pro forma* to allow the withdrawal of the appeal,
reserving the question for the court in banc, and directed the trial
to proceed.

The defendant's counsel then requested the court to instruct
the jury:—

1. That there is nothing in the Acts of Assembly relating to
lateral railroads, to authorize a proceeding against the owner of
a stratum of coal, as contradistinguished from the proprietor of
the land; the said acts applying only to the landowner, and
awarding damages only to him.

2. That the seizure of private property for private use has
no warrant in the constitution of this state, and is at war with
the object of all just government, and the fundamental law of
the social state; and that if it may be so seized, it may be as
well seized without compensation as with it.

3. That under the Acts of Assembly governing cases of this
sort, the true measure of damages would be the difference be-
tween the value of the coal as unaffected by the construction and
use of the plaintiffs' railroad, and the value thereof as affected
thereby; and that any depreciation arising from increased diffi-
culty of access, occasioned by the construction and use of said
road, is to be taken as a direct and immediate injury or damage
thereto.

4. That the opinions of witnesses largely engaged in the busi-
ness of coal-mining, and conversant with the value of coal-mines,
and the means of working the same, are entitled to great weight
with the jury, and in the absence of contradictory or conflicting
evidence are to be received and treated as conclusive by them,
if not unreasonable or incredible in themselves.

The learned judge, after stating the case, charged the jury,
*inter alia,* as follows:—

[Brown *v*. Corey & Peterson.]

" The chief controversy in this case arises out of the question as to the measure of damages.

" Evidence was offered in a great variety of ways by the learned and ingenious counsel for the defendant to sustain his allegations, but were rejected by the court under the authority of recent decisions of the Supreme Court, as being too remote and contingent to form a legitimate element in ascertaining the damages occasioned by the construction and use of the plaintiffs' road. The defendant was allowed to prove what was the comparative value of his body of coal, before and after this road was made, as affected by its construction and use.   And under this offer, which was admitted by the court, several witnesses testified that before this road was made, the defendant's coal was worth four or five hundred dollars an acre; and since that it would not be worth more than one hundred dollars.   But when re-examined, they gave as the reasons or grounds of their opinions, the dangers and delays of crossing the plaintiffs' road—no other reasons were assigned, nor could be, under the circumstances of this case.

" These opinions, therefore, being based on imaginary and contingent facts, too remote and uncertain to sustain them, must be disregarded by the jury, inasmuch as the evidence offered to prove these contingencies was rejected by the court.   The offer, as we ruled on the question of its admission, was right, under the rule laid down by the Supreme Court in Watson *v*. The Pittsburgh and Connellsville Railroad Co., but the mode of proof, as in that case, was defective.

" ' The true measure of compensation,' says the Supreme Court, ' is the difference between what the property would have sold for, unaffected by the railroad, and what it would have sold for as affected by it;' and this, we instruct you, is the law in this case. This is the great fact in the cause; but the mode of proving it must be governed by the rules of law regulating questions of evidence. . The mere opinion of a witness, without facts to sustain it, is entitled to no weight with the jury, and these facts must be proved in the ordinary way.

" Now if the defendant had opened his mine in the vicinity of the plaintiffs' road, and ascertained by actual experiment that its capacity was insufficient to accommodate both parties, this would have been a fact admissible in evidence; or if he had constructed his road across the plaintiffs' road, and found, after a full trial, that the two roads interfered with the working of each other, this would have been a fact susceptible of proof.   But the defendant rested his case on the mere opinion of witnesses based on no ascertained facts.   These supposed or imaginary facts might all vanish beneath the truth of actual experiment.

" I am not aware of any evidence in the cause that would justify a recovery in this case by the defendant of any damages beyond the actual value of the coal taken by the plaintiffs in the

[Brown *v.* Corey & Peterson.]

construction of their road, which would be a strip twenty feet wide, with interest thereon. This amount he is clearly entitled to recover.

" The court declines to charge as requested in the first and second points. The second point has no applicability to this case, it having been so frequently decided by the Supreme Court that the Acts of Assembly under which these proceedings were had are not unconstitutional; that it is entirely too late in the day to raise that question before this court. If the learned counsel can persuade the Supreme Court to overrule all their decisions on that subject, we will then listen to his proposition.

" The first branch of the third proposition has already been affirmed in the general charge. The latter branch might perhaps be true also, if the proof were sufficient to sustain it. But in this case it is not. It rests merely on the speculative opinions of the witnesses, as to some imaginary difficulties that may never arise—on this sort of evidence we have already commented in the charge.

" The fourth point is sufficiently answered in the charge."

Under these instructions there was a verdict and judgment for plaintiffs, Corey and Peterson, and the damages of William H. Brown, the defendant, were assessed at $239.50. The case was thereupon removed into this court by the defendant, who assigned for error here the rejection of the evidence offered by him as above stated, and the refusal of the court to affirm the points presented as above; and also the refusal of the court below to permit him to withdraw his appeal.

*Burgwin* and *Woods*, for plaintiff in error.

*Penney* and *Acheson*, for defendant.

The opinion of the court was delivered, May 6th 1863, by

WOODWARD, J.—The defendants in error having become owners of certain coal lands lying in Versailles township, Allegheny county, within three miles of the Monongahela navigation, applied to the District Court, under the Lateral Railroad Law, for a right of way, underground, through a stratum of coal, owned by the plaintiff in error, William H. Brown. A view was had of the premises, which resulted in an assessment of damages to Brown of $2500, from which he appealed on the 13th of March 1860. On the trial of the cause in court, in April 1862, he asked leave to withdraw his appeal, and prayed the court to confirm the report of viewers. Both requests were denied him, and the result was a verdict in his favour for only $239.50.

The refusal of the court to suffer a withdrawal of the appeal is now assigned for error. We think there was no error in this.

The Act of Assembly gives either party a right of appeal

[Brown v. Corey & Peterson.]

within twenty days after the report of viewers is filed, but if one party appeals the other need not. The cause is tried *de novo* on the appeal, the appellant possessing no advantage over the appellee by reason of having entered the appeal. If the successful party may appeal, and, after the twenty days have elapsed, discontinue his appeal, he may thereby deprive his adversary of the retrial to which he is entitled. If such a practice were tolerated it would lead to oppression and fraud. It has long been the policy of our statutes to forbid the withdrawal of appeals from awards of arbitrators without the consent in writing of the opposite party, and in Monongahela Navigation Company *v.* Blair, 8 Harris 78, the same rule was applied to an assessment of damages in a corporation case. It is equally applicable to cases under the Lateral Railroad Law.

Brown owns only the coal-seams through which Corey & Peterson sought to push their railroad, the title to the surface being in David Shaw; and it is insisted that there is nothing in the Acts of Assembly relating to lateral railroads, which authorizes a proceeding against the owner of a stratum of coal as contradistinguished from the proprietor of the land.

By an Act of 16th April 1838, P. L. 637, the Quarter Sessions were empowered to lay out private roads, "under the surface of any land to coal-mines," and by the 2d section of the Act of 28th March 1840, Purd. 848, incorporated companies and individuals were authorized to construct railroads with one or more tracks "under the surface *over* any intervening lands, not exceeding six miles in length"—the proceedings in such case to be according to the Act of 1832, relative to lateral railroads. The word "over" in the Act of 1840, is probably a misprint for "of." The surface-owner, Shaw, is not made a party to this proceeding, and is not objecting to the road in question. How can Brown deny that he is an owner of "land?" He holds a conveyance duly executed and recorded for "fifty acres of merchantable black stone coal," with rights of way above ground and under ground, through the lands of his grantor, and with privileges of drainage and ventilation, and he holds it all to himself, his heirs and assigns for ever. In Caldwell *v.* Fulton, 7 Casey 475, the nature of a mine interest severed from the ownership of the surface was very fully considered, and it was treated as a corporeal hereditament. Indeed it was said in terms that coal and minerals in place are land. There can be no question, therefore, that what Brown holds is within the very terms of the Act of 1840, and being a coal-bank, it is peculiarly within the spirit and intent of the act. For it was the purpose of all our legislation touching lateral railroads to bring coal and other minerals into market, and to this end every such road was designed to be a public highway, open to every transporter who would pay the legal tolls, as well as to the party whose capital

constructed the road. Brown's coal needs a railroad for its outlet. There is far less reason for his objecting to the applicability of the Acts of Assembly to his mineral property, than there would be if he were a farmer on the surface, and the proposition were to run the road through his fields.

Another objection that he urges is founded in the covenants of the deed, by which Moses Corey conveyed to him the stratum of coal under the fifty acres in question. He claims that the petitioners having purchased their landing and part of their coal from Corey, subsequently to his (Brown's) purchase, were bound by Corey's covenants, as running with the land. These covenants are the usual ones of seisin and warranty, and we do not see how they can estop the petitioners from proceeding under the Lateral Railroad Law. The argument seems to assume that the private property of Brown is to be taken for the private use of the petitioners—a thing which the legislature could not authorize to be done. If the Lateral Railroad Law had not been, long ago, rescued from this reproach, it had been condemned, long ago, as unconstitutional. It was founded in the experience of a great public want, and was passed for public purposes. Was not the development of our mineral resources a public object? Was it not a great public interest to augment the tonnage of canals and railroads, which had cost the state many millions to construct? The man whose minerals lay within three miles of a state canal but could get them into it only by crossing the intervening land of an unneighbourly owner, had been taxed as well as his froward neighbour to build that canal—was it not reasonable and just to give him not a private, but a public way, he paying all damages he should occasion? Nobody will doubt the state might enter and build a railroad on his land—it is equally clear that the state might delegate her right of eminent domain to a corporation or an individual. But then the entry is under the state and in pursuance of public law. No covenants or private contracts between citizens can possibly be violated in such a case, because none can stand in the way of state authority. It is a resumption by the sovereign of a clear right of sovereignty, in subordination to which the covenants of the deed were made. Had the parties contracted expressly against the exercise of this right, they could not have bound the sovereign—much less can their covenants, made for other purposes, be permitted to have the effect claimed for them.

The main question below related to the measure of damages, and on this subject the record reads oddly. The petitioners having built their road before the cause was tried, the defendant made a great number of unsuccessful offers of evidence on the trial, with a view of showing that it had materially impaired the value of his property. These were rejected for the general reason that the circumstances, to which the witnesses referred

themselves, were too indefinite and speculative in character.    It would seem that several witnesses had been permitted to testify that the property was greatly depreciated by the construction and use of the petitioners' road, but on cross-examination, when pressed for the grounds of their opinion they referred themselves to those circumstances, the direct proof of which had been rejected.  " These opinions" (said the learned judge in his charge), " being based on imaginary and contingent facts, too remote and uncertain to sustain them, must be disregarded by the jury, inasmuch as the evidence offered to prove these contingencies was rejected by the court."

This put out of the cause the only evidence which the defendant had been permitted to give under the rule laid down by this court in Watson *v.* The Railroad Company, 1 Wright 469, and enabled the learned judge to say, " I am not aware of any evidence in the cause that would justify a recovery in this case, by the defendant, of any damages beyond the actual value of the coal taken by the plaintiffs in the construction of their road, which would be a strip twenty feet wide, with interest thereon.    This amount he is clearly entitled to recover."

The third point of defendant's counsel had called upon the court, in substance, to lay down the measure of damages, so clearly stated in that reported case.    The judge recognised the case and quoted from it, but gave the defendant no benefit whatever from it, because his witnesses had formed opinions on facts which the judge thought were insufficient to sustain them.    This court had said, in that case, " It is upon the whole tract the road is located, though only a part is actually occupied.    The injury is therefore done to the tract *as a whole,* of whatever components that injury may consist.    The exclusive appropriation of a part, the inconvenience arising from division, or from increased difficulty of access, and the cost of additional fencing, are alike the direct and immediate result of the construction of the road."

Yet, the present cause was so tried as to exclude from the jury all consideration of the effect of the road on the *whole tract,* and to confine it to the twenty feet actually occupied.

This cannot be right.    An owner has good cause to complain that such an assessment of his damages is inadequate.    They are *not* indeed *to* be assessed upon mere speculative theories, but such injuries as the common law recognises as fit subjects for compensation may be proved.    And, as was said in the above-cited case, " when damages are assessed, after the completion of a railroad, it is possible to prove, with some reliable certainty, the difference in the market value of the land through which it passes, caused by the construction.    Then the value at the time of the entry on the land is known, and so is its value, as affected by the improvement."

[Brown *v.* Corey & Peterson.]

It cannot be doubted that an entry on a man's land, without his consent, and doing anything there that impairs its value, is actionable, and a fit subject for damages at common law. The entry is legalized in instances like the present, but the damages are to be ascertained as if it had not been, and no fairer test can be applied than to compare the present value of the whole tract with its value before the entry and improvement were made.

To enable the jury to do this, they are entitled to the benefit of the opinions of witnesses of skill and judgment, who have had opportunities to learn the value of the property in question, or of similar properties in the same neighbourhood. The value of real estate which has not been offered in market is often a very difficult question. It belongs to that class of facts which exclude direct evidence to prove them, being such as are either necessarily or usually imperceptible by the senses, and therefore incapable of the ordinary means of proof. Pedigree, character, prescription, custom, boundary, and all those questions of skill and art to which experts are commonly called, are of this class. Now, when witnesses lay before a jury their opinions of the value of a particular piece of real estate, it is usual and proper to bring out the grounds of their opinions, that a jury may see how far they are sound and trustworthy. The grounds of the opinion, like the opinion itself, should generally be referred to the jury to judge of. They should have been in this case. The jury's estimate of the opinions of witnesses would necessarily be much affected by the grounds they rested on, and it was error to deprive the party of the full benefit of his testimony.

What were the "imaginary and contingent facts" that led the judge to the exclusion of witnesses' opinions? He tell us that "they were the dangers and delays of crossing the plaintiffs' road." Two underground railroads crossing each other at grade, and both worked in the darkness of a coal-mine, were sure, in the opinion of witnesses, to lead to disasters and loss of property, perhaps of life. They supposed that the road of the petitioners had virtually prevented Brown from building and safely working the road essential to the enjoyment of his own estate, and hence their estimate of his damages.

Now, says the learned judge, "If he had constructed his road across the plaintiffs' road, and found, after a full trial, that the two roads interfered with the working of each other, this would have been a fact susceptible of proof." Undoubtedly. But is an owner to wait for the damages to which he is entitled from a party entering into his land, until he shall have done his best to repair his injuries, and then charge only the insurmountable residue against the stranger? The constitution, which requires the damages to be paid or secured *before entry* was not conceived in that spirit. It treats the landowner as entitled to the quiet

enjoyment of all his rights until he is compensated for giving them up. The supposition on which the witnesses went was not unreasonable, and considering that the damages were to be estimated before actual experience could be had of the working of distinct roads, we see no reason for excluding it.

The question may be difficult, but that is a reason why the facts and circumstances to which witnesses referred their opinions, should have been freely investigated. Railroads crossing each other at grade are always dangerous, whether in the darkness of the coal-mine or in the light of the upper day; but could not these roads, at a small increase of expense, be made to cross one above the other? Was it indispensable that they should cross at all? Would not one road-bed, twenty feet wide, admit rails enough to serve both mines? The Act of Assembly provides that if parties cannot agree upon "the mode, manner, or point of connection" of their respective roads, the same shall be determined by the viewers. Was there any attempt in this case to perform this duty?

These questions, and perhaps others, were fit subjects of investigation before a jury, whose general duty it was to determine if the defendant had been injured at all, and if at all, to what amount, by the railroad of the petitioners. And when I say injured, I mean whether the value of his fifty acres, through which the petitioners ran their road, had been impaired and diminished?

We have looked through the bills of exception, and so far as the matters offered related to the question of damages, we think they were all admissible except evidence of the title and position of other lands of the defendant. Evidence relative to other coal than that of the fifty acres would seem to be irrelevant.

From what we have said, it is apparent that the third and fourth points, on the part of the defendant, should have been substantially affirmed in the charge, and that no other errors are found in the charge.

The judgment is reversed, and a *venire facias de novo* awarded.